1  BROWN WHITE & NEWHOUSE LLP
   Thomas M. Brown (Bar No. 117449)
2  Caleb E. Mason    (Bar No. 246653)
3  333 South Hope Street, 40th Floor
   Los Angeles, California 90071-1406
4  Telephone:  213. 613.0500
   Facsimile:   213.613.0550
5  tbrown@brownwhitelaw.com
   cmason@brownwhitelaw.com
6
7  Attorneys for Plaintiff
   P-COVE ENTERPRISES, INC.
8
9           UNITED STATES DISTRICT COURT
10          CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| P-COVE ENTERPRISES, INC., dba BUYERS CONSULTATION SERVICE, INC., a California corporation,<br><br>           Plaintiff,<br><br>v.<br><br>CAPITAL TRADING LLC, a New Hampshire corporation, NIKOLAS GALIATSATOS, an individual, and DOES 1 through 10, inclusive,<br><br>           Defendants. | Case No.:<br><br>Judge:<br><br>**COMPLAINT FOR:**<br><br>**(1) TRADEMARK INFRINGEMENT**<br>**(2) MONEY HAD AND RECEIVED**<br>**(3) CONVERSION**<br>**(4) MISAPPROPRIATION OF TRADE SECRETS**<br>**(5) UNFAIR COMPETITION IN VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200**<br><br>**JURY TRIAL DEMANDED** |

# I.

# INTRODUCTION

1. Defendant NIKOLAS GALIATSATOS ("Galiatsatos") worked briefly for Plaintiff P-COVE ENTERPRISES, INC., dba BUYERS CONSULTATION SERVICE, INC. ("BCS"). Thereafter, Galiatsatos used BCS's name and letterhead for fraudulent activities. He falsely represented to third parties that he was a BCS vice president, and duped customers into believing they were doing business with BCS. He then substituted his own company's tax identification number for payments, keeping all payments for himself. And he failed to perform the services that he contracted to perform under BCS' name, for his own monetary gain.

2. For more than two decades, BCS has been an industry leader in the recycling business, with a focus on processing end-of-life electronics for corporate clients. BCS's customer list includes Costco, IBM, Target, Pep Boys, Amazon, Best Buy, and GENCO.

3. In or about February 2007, when BCS President Jonathan Manhan ("Manhan") was exploring expanding BCS's operations into new regions of the country, Manhan met Galiatsatos. Galiatsatos was doing business through Defendant Capital Trading LLC ("Capital Trading"). (Galiatsatos, Capital Trading, and Does 1-10 are collectively referred as "Defendants.") Galiatsatos told Manhan that he had contacts in New England and the Midwest and could promote BCS's business in those regions. Manhan hired Galiatsatos as an employee for BCS in or around July 2010. Galiatsatos' duties were to solicit new business on behalf of BCS in the Northeast and to manage BCS's facilities in Hudson, New Hampshire and Indianapolis, Indiana.

4. In or around November 2011, BCS and Galiatsatos terminated their employment relationship. BCS and Galiatsatos thereafter agreed that Galiatsatos could continue to solicit new business on behalf of BCS as an independent contractor.

5. Instead, Galiatsatos entered into contracts for his own financial benefit, misrepresenting himself to third parties as an officer of BCS, and not disclosing to

Case 2:14-cv-08898-GHK-RZ   Document 1   Filed 11/17/14   Page 3 of 16   Page ID #:3

1  BCS these contracts.  In June 2012, Galiatsatos entered into an agreement with
2  NetScout Systems, Inc. ("NetScout"), a Massachusetts corporation, to take delivery of
3  used hard drives for recycling.  The contract is attached hereto **as Exhibit A**.
4     6.   Galiatsatos did not notify BCS of his communications or contract with
5  NetScout.  BCS never approved the contract, nor had knowledge of it.  BCS never
6  received any money from the contract.
7     7.   Galiatsatos went to considerable lengths to deceive NetScout and pass
8  himself off as a BCS executive.  First, Galiatsatos affixed to the contract BCS's logo,
9  as follows:



15     8.   Second, Galiatsatos signed the contract as "Vice President" of BCS, a
16  position he did not hold, and had never held.
17     9.   Third, Galiatsatos deceptively provided NetScout with the tax
18  identification number for his own company, Capital Trading.  He submitted a W-9
19  form to NetScout listing his company name as "Capital Trading / BCS."  Galiatsatos
20  then kept all of the payments from NetScout for himself and never notified BCS.
21  BCS remained entirely unaware of the entire transaction.
22     10.  Galiatsatos passed himself off as a BCS employee because BCS had two
23  assets that Galiatsatos and Capital Trading lacked: BCS had a national reputation in
24  the industry, and BCS had industry certifications for recycling electronic equipment
25  that Capital Trading did not.  On information and belief, the value of the contract was
26  approximately $350,000.
27     11.  NetScout performed under the contract, paying Galiatsatos and providing
28  hard drives for destruction to him, and Galiatsatos promised to recycle and destroy

2
COMPLAINT BY P-COVE ENTERPRISES INC.
1182494.1

them. Galiatsatos did not recycle the NetScout hard drives as the contract provided, but rather sold the hard drives to third parties, in direct breach of the terms of the contract.

12. During the summer of 2014, Galiatsatos also contacted other BCS customers, this time on his own behalf, through Capital Trading, and attempted to persuade them to transfer their business to him. The customers he contacted included IBM and GENCO, both large corporations with substantial recycling contracts with BCS. Galiatsatos improperly took advantage of BCS's trade secrets and proprietary information he had gathered during his employment with BCS, regarding BCS's pricing structures and recycling services, purporting to offer BCS's customers the same services at slightly better prices.

13. Galiatsatos' fraudulent conduct harmed BCS's reputation in the industry and its ability to secure contracts and customers. Galiatsatos' conduct caused BCS to lose significant goodwill in the marketplace. BCS will likely suffer considerable business losses as a result.

## II.
## THE PARTIES

14. BCS is, and all times relevant to this complaint was, a California corporation with its principal place of business in Canoga Park, California, in the Central District of California. BCS is in the recycling business, including processing end-of-life electronics, goods that customers have returned, scrap metal, and surplus inventory. BCS collects, processes, refurbishes, and recycles these products. BCS is an industry leader in environmentally conscious recycling of end-of-life electronics.

15. Galiatsatos is an individual and resident of Windham, New Hampshire. Galiatsatos is the president of Capital Trading, a corporation organized under the laws of New Hampshire with its principal place of business in New Hampshire. Capital Trading is also in the recycling business.

16. The true names, identities, and capacities, whether individual, corporate,

1  associate, or otherwise of Defendants Does 1 through 10, inclusive, are unknown to
2  BCS at the time of filing this Complaint, and therefore BCS sues said Defendants by
3  fictitious names.  Upon information and belief, BCS alleges that Does 1 through 10
4  are persons or entities that are legally responsible to BCS for the relief sought herein
5  and/or are necessary parties to this litigation.

6       17.   BCS is informed and believes, and on that basis alleges, that the
Defendants, and each of them, were the agents, employees, partners, joint venturers,
co-conspirators, owners, principals, and employers of the remaining Defendants, and
each of them, and are, and at all times in this Complaint mentioned were, acting
within the course and scope of that agency, partnership, employment, conspiracy,
ownership, or joint venture.  BCS is further informed and believes, and on that basis
alleges, that the acts and the conduct in this Complaint alleged of each such Defendant
were known to, authorized by, and/or ratified by the other Defendants, and each of
them.

### III.
### JURISDICTION AND VENUE

       18.   Jurisdiction and venue are proper in this Court pursuant to 28 U.S.C. §
1332(a)(1) because this case is between citizens of different states and because the
amount in controversy exceeds $75,000, exclusive of interests and costs; and pursuant
to 28 U.S.C. § 1332, because the action arises in part under the laws of the United
States, specifically 15 U.S.C. § 1125(a).

       19.   Specifically, BCS is a California limited liability company, with its
headquarters and principal place of business located at 8745 Remmet Avenue, Canoga
Park, California, 91304.

       20.   Galiatsatos is a citizen of New Hampshire. Capital Trading is a New
Hampshire corporation with its principal place of business in Hudson, New
Hampshire.

       21.   Personal jurisdiction is proper because Defendants have extensive contact

with, and do substantial business within, the State of California and this judicial district. Galiatsatos entered into an employment relationship with BCS in California, knowing that BCS's business was based in this judicial district.

22. Venue exists in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391 because Defendants have extensive contacts within this judicial district. Galiatsatos entered into an employment relationship with BCS in California, knowing that BCS's business was based in this judicial district, and performed many of his employment duties through Capital Trading. And Defendants have caused injury to BCS in this judicial district.

## IV.

## FACTUAL BACKGROUND

23. BCS has been in the recycling business for over 25 years. BCS buys surplus inventory from companies, ranging from scrap metal to electronic equipment, and either recycles the equipment or refurbishes it for resale.

24. BCS has compiled a large client list and has developed significant proprietary information related thereto. This information includes customers' contact and account information, and information regarding customers' recycling needs, constraints, and price structures ("Customer Information"). This Customer Information is confidential and not available to the public, and BCS expended substantial time and money developing said Customer Information for its sole and exclusive advantage and benefit. BCS has taken reasonable precautions to protect the secrecy of the Customer Information.

25. In or around July 2010, Galiatsatos entered into an employment agreement with BCS to work as a salesman. Throughout the parties' relationship, Galiatsatos assured BCS that he would solicit business on BCS' behalf with undivided loyalty and act in the best interests of BCS. Galiatsatos' duties for BCS included soliciting new clients on behalf of BCS.

26. As part of his duties with BCS, BCS provided Galiatsatos with BCS's

proprietary and confidential Customer Information for Galiatsatos to use in soliciting business for BCS. Galiatsatos represented that he would maintain the confidentiality of BCS's Customer Information, would not use such information except for the benefit of BCS, and would not solicit or encourage any of BCS's customers to move their business to another recycling company.

27. Galiatsatos remained an employee of BCS until around November 2011, when BCS and Galiatsatos mutually ended their employer-employee relationship. BCS and Galiatsatos agreed that although Galiatsatos would no longer be a BCS employee, Galiatsatos could continue to solicit new business for BCS on a freelance and independent contractor basis and would be compensated based on the profits from any transactions he originated.

28. Galiatsatos subsequently executed a contract, purportedly on behalf of BCS, but without notifying BCS. On or about June 6, 2012, purporting to act on behalf of BCS, Galiatsatos and Capital Trading entered into a Professional Services Agreement with NetScout (the "NetScout Contract"), attached hereto as **Exhibit A**. In the NetScout Contract, Defendants agreed to take delivery of and recycle NetScout hard drives.

29. Without the consent or knowledge of BCS, Galiatsatos improperly used BCS's name and logo on the NetScout Contract, in order to deceive NetScout into believing that it was entering into an agreement with BCS. Additionally, as part of his artifice and scheme to defraud, and without the knowledge or consent of BCS, Galiatsatos signed the Agreement as the "Vice President" of BCS, a position he did not hold at that time, and has never held.

30. In order to conceal his scheme and artifice to defraud from BCS, and to ensure that he would receive all the money from the contract for himself, Galiatsatos provided NetScout with an Internal Revenue Service W-9 form, listing his company name as "Capital Trading / BCS," giving the tax identification number for his own company, Capital Trading, and misrepresenting to NetScout that the number belonged

to BCS.

31. Galiatsatos and Capital Trading then accepted delivery of hard drives from NetScout, and NetScout paid by issuing checks to "Capital Trading / BCS," which Galiatsatos then deposited. Galiatsatos never informed BCS of these payments, which totaled approximately $100,000 between June 2012 and September 2014.

32. Additionally, Galiatsatos and Capital Trading did not destroy the NetScout hard drives as required by the NetScout Contract, but instead resold them to third parties, in direct contravention of the terms of the contract.

33. Galiatsatos and Capital trading also solicited business from BCS's existing customers, using confidential and proprietary information Galiatsatos obtained during his employment with BCS. In or about August 2014, Galiatsatos contacted IBM, one of BCS's biggest customers. Based on the proprietary Customer Information, Galiatsatos offered IBM recycling services from Capital Trading at a rate that undercut BCS. Galiatsatos repeated this tactic with another BCS customer, GENCO, also in or about August 2014. Galiatsatos used the proprietary BCS Customer Information in order to unfairly compete with BCS.

34. Galiatsatos' actions were all carried out in direct contravention of promises and representations he made to BCS at the conclusion of his employment with BCS. Specifically, he promised that, in exchange for being permitted to continue freelance solicitation for BCS, he would not trade on BCS's name without BCS's express consent and would not hold himself out to be a representative of BCS.

35. These representations were false. Galiatsatos knew they were false at the time he made them because he intended to misappropriate and use BCS's proprietary information. He intended that BCS rely on these material misrepresentations by not investigating the activities of Capital Trading. Galiatsatos and Capital Trading were in fact soliciting business for themselves by trading on BCS's name and reputation. BCS reasonably relied on Galiatsatos' misrepresentations, which caused BCS harm, because Defendants were able to execute the NetScout contract without BCS'

knowledge or consent, and receive payment from NetScout.

36. Defendants' resale of the NetScout hard drives exposes BCS to significant risk of legal liability. Specifically, if a customer's hard drive that was to be destroyed was in fact resold, and data therein were subsequently recovered and used to the detriment of the customer, the customer would have a potential legal claim against the recycler that failed to destroy the hard drive.

37. BCS did not know of these concealed facts and reasonably relied on Galiatsatos' representations. BCS was deprived of the benefits of the NetScout contract, and Galiatsatos' deception was a substantial factor in causing that harm. On information and belief, Galiatsatos continues to enter into contracts using BCS's name and likeness and is continuing to interfere with future and present business. Galiatsatos has not paid BCS any money for his use of BCS's name and likeness.

## V.
## **CLAIMS FOR RELIEF**
## **FIRST CLAIM FOR RELIEF**
## **(Trademark Infringement Pursuant to 15 U.S.C. § 1125(a) – Against All Defendants)**

38. BCS incorporates by reference and realleges Paragraphs 1 through 37 as though fully set forth herein.

39. The name "Buyer's Consultation Service" and the associated logo which appears above in Paragraph 9 and in **Exhibit A**, are valid, protectable trademarks.

40. "Buyer's Consultation Service" and the associated logo are inherently distinctive words, symbols, and devices which intrinsically identify a particular source of services in the market: namely, the services of BCS.

41. "Buyer's Consultation Service" has acquired a distinctive meaning through the years BCS has been in business, creating market recognition among the population of recycling-services consumers.

42. BCS owns the trademark to "Buyer's Consultation Service" and the BCS

1  logo.

2      43.    BCS used "Buyer's Consultation Service" and the BCS logo to market its services throughout the United States before Defendants used the name and logo.

    44.    Defendants, and each of them, used the marks "Buyer's Consultation Service" and the BCS logo without the consent of BCS, and in a manner that was likely to cause confusion among ordinary customers as to the source, sponsorship, affiliation, or approval of Defendants' services.

    45.    Defendants, and each of them, made false and misleading statements about their association with BCS, and about BCS's participation in the NetScout transactions, without the consent of BCS, and in a manner that was likely to cause confusion among ordinary customers as to the source, sponsorship, affiliation, or approval of Defendants' services

    46.    Defendants, and each of them, conspired with each other in the scheme and acts set forth herein, by agreeing to said scheme and or/participating in it; and aided and abetted and otherwise acted in concert in the commission of these acts, in that Defendants knew such conduct was wrongful and they gave substantial assistance or encouragement to so act, and gave substantial assistance in accomplishing the result.

    47.    Defendants' acts were and are willful and malicious, and made with a conscious disregard of the BCS' rights, in that they secretly planned to misappropriate and use the BCS' name, reputation, logo, letterhead, and Customer Information to injure BCS and/or obtain for themselves the financial rewards due to BCS. Defendants, and each of them, had advance knowledge that their agents and/or employees would so act and were so acting, and/or authorized and or/ratified such continued violations. As a result, BCS is entitled to punitive damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### (Money Had and Received – Against All Defendants)

48. BCS incorporates by reference and realleges Paragraphs 1 through 47 as though fully set forth herein.

49. Galiatsatos received money which was intended to be used for the benefit of BCS. Galiatsatos did not receive the money the money in good faith. The money was not used for the benefit of BCS, and Galiatsatos has not paid to BCS any money that he received from his fraudulent NetScout contract.

50. Defendants, and each of them, conspired with each other in the acts and scheme set forth herein, by agreeing to said scheme and or/participating in it; and aided and abetted and otherwise acted in concert in the commission of these acts, in that Defendants knew such conduct was wrongful and they gave substantial assistance or encouragement to so act, and gave substantial assistance in accomplishing the result.

51. Defendants' acts were and are willful and malicious, and made with a conscious disregard of BCS' rights, in that they secretly planned to misappropriate and use BCS' name, reputation, logo, and Customer Information to injure BCS and to obtain for themselves money and business due to BCS. Defendants, and each of them, had advance knowledge that their agents and/or employees would so act and were so acting, and/or authorized and or/ratified such continued violations. As a result, BCS is entitled to punitive damages in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF
### (Conversion – Against All Defendants)

52. BCS incorporates by reference and realleges Paragraphs 1 through 51 as though fully set forth herein.

53. BCS's customer information, pricing information, name, logo, reputation, good name and good will in the electronic recycling industry were assets of the company. BCS has at all relevant times had ownership and possessory rights thereto.

54. Defendants substantially interfered with BCS's ownership and possessory interest in these assets and converted the aforementioned property and

1 sums to their own use.

2     55.    BCS did not consent to Defendants' use of its property;

3     56.    As a result of Defendants' conversion, BCS has suffered damages, including lost future and present business opportunities and profits, as well as reputational harms.

    57.    BCS spent a large amount of time and expended large amounts of money, in amounts subject to proof at trial, in an attempt to recover the converted property.

    58.    Defendants' conduct was a substantial factor in causing harm to BCS, because Galiatsatos and Capital Trading entered into contracts using BCS' property without the consent of BCS.

    59.    Defendants, and each of them, conspired with each other in the scheme and acts set forth herein, by agreeing to said scheme and or/participating in it; and aided and abetted and otherwise acted in concert in the commission of these acts, in that Defendants knew such conduct was wrongful and they gave substantial assistance or encouragement to so act, and gave substantial assistance in accomplishing the result.

    60.    Defendants' acts were and are willful and malicious, and made with a conscious disregard of BCS's rights, in that they secretly planned to misappropriate and use BCS's confidential and trade secret information with the deliberate intent to injure BCS's business and/or obtain for themselves the financial rewards due to BCS. Defendants, and each of them, had advance knowledge that their agents and/or employees would so act and were so acting, and/or authorized, and/or ratified such continued violations. As a result, BCS is entitled to punitive damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### (Misappropriation of Trade Secrets Pursuant to California Civil Code § 3426 – Against All Defendants)

    61.    BCS incorporates by reference and realleges Paragraphs 1 through 60 as

though fully set forth herein.

62. BCS's Customer Information constitutes and contains trade secrets within the scope of the Uniform Trade Secrets Act, California Civil Code Sections 3426 through 3426.11.

63. By virtue of Galiatsatos' employment with BCS, Defendants, and each of them, gained access to these trade secrets, and thereafter misappropriated and used them as set forth herein.

64. Defendants' prior, continued, and threatened misappropriation and use of these trade secrets is, and would be, in violation of the Trade Secrets Act.

65. Defendants, and each of them, conspired with each other in the scheme and acts set forth herein, by agreeing to said scheme and or/participating in it; and aided and abetted and otherwise acted in concert in the commission of these acts, in that Defendants knew such conduct was wrongful and they gave substantial assistance or encouragement to so act, and gave substantial assistance in accomplishing the result.

66. As a proximate result of Defendants' conduct, BCS has been damaged in an amount to be determined at trial.

67. BCS will also suffer great and irreparable injury in that Defendants, and each of them, will continue to engage in said trade secret violations unless restrained by order of this court, and BCS will lose the business advantage it has acquired as a result of expending time and money to develop its Customer Information.

68. Defendants' acts were and are willful and malicious, and/or made with a conscious disregard of BCS's rights, in that they secretly planned to misappropriate and use BCS's confidential and trade secret information with the deliberate intent to injure BCS's business and/or obtain for themselves the financial rewards due to BCS. All Defendants, and each of them, had advance knowledge that their agents and/or employees would so act and were so acting, and/or authorized and/or ratified such

continued violations.  As a result, BCS is entitled to punitive damages in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### (Unfair Competition Pursuant to California Business and Professions Code Section 17200 —Against All Defendants)

69.    BCS incorporates by reference and realleges Paragraphs 1 through 68 as though fully set forth herein.

70.    Defendants, and each of them, engaged in unlawful, unfair, and fraudulent business acts and practices when they falsely and deceptively claimed to be affiliated with BCS in order to secure the NetScout contract; deceptively and without authorization utilized the BCS logo, and misrepresented to NetScout that Galiatsatos was a BCS employee and officer; falsely and deceptively provided NetScout with the Capital Trading tax identification number rather than the BCS tax identification number, so that they could conceal NetScout's payments from BCS; misappropriated BCS's trade secrets, namely its Customer Information, in order to attempt to persuade BCS's customers to move their recycling business to Capital Trading.

71.    Defendants' acts were unlawful, unfair, and fraudulent.  The unauthorized use in a commercial transaction of a tax identification number belonging to another is unlawful under state and federal criminal and civil law, and is also unfair and fraudulent.  It is unfair and fraudulent to falsely claim to be employed by or associated with a business in order to consummate a commercial transaction.   And it is unfair for an employee to misappropriate the confidential and proprietary information of his employer, then use it for the purpose of soliciting the employer's customers on his own behalf.

72.    BCS suffered a direct injury and lost money and property as a result of Defendants' unlawful, unfair, and fraudulent business acts.  Specifically, BCS lost payments from NetScout to which it was due, and which Galiatsatos and Capital Trading wrongfully redirected and misappropriated.  BCS also suffered reputational

harms and loss of trust in the industry, by being associated with Galiatsatos' fraudulent acts.

73. Moreover, on information and belief, Galiatsatos is continuing to engage in unfair business practices as set forth herein. If not enjoined from doing so, he is likely to continue.

## PRAYER FOR RELIEF

WHEREFORE, BCS prays that this Court enter judgment against Defendants as follows:

1. For actual damages according to proof at trial;
2. For punitive damages;
3. For interest according to law;
4. For disgorgement of all sums by which Defendants were unjustly enriched;
5. For injunctive relief as authorized by law;
6. For costs associated with the prosecution of this action; and
7. For all other relief as the court deems just and proper.

DATED: Nov. 17, 2014          BROWN WHITE & NEWHOUSE LLP

By  /s/ *Caleb E. Mason*
THOMAS M. BROWN
CALEB E. MASON
Attorneys for Plaintiff
P-COVE ENTERPRISES INC. dba
BUYERS CONSULTATION SERVICES INC.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.

DATED:  Nov. 17, 2014　　　　　　　BROWN WHITE & NEWHOUSE LLP

By  /s/ *Caleb E. Mason*
　　　THOMAS M. BROWN
　　　CALEB E. MASON
　　　Attorneys for Plaintiff
　　　P-COVE ENTERPRISES INC. dba
　　　BUYERS CONSULTATION SERVICES INC.